

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## NO. PD-0659-15

### PAUL HENRI WAGNER, Appellant

### v.

### THE STATE OF TEXAS

### ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW
### FROM THE FIFTH COURT OF APPEALS
### DALLAS COUNTY

ALCALA, J., delivered the opinion of the Court in which KEASLER, HERVEY, RICHARDSON, YEARY, NEWELL, KEEL, and WALKER, JJ., joined. KELLER, P.J., filed a dissenting opinion.

### O P I N I O N

In this case, we consider the constitutionality of Penal Code Section 25.07(a)(2)(A).[1]

Under that statute, the State may prosecute an individual who has intentionally or knowingly

communicated in a "threatening or harassing manner" with another person in violation of a

judicially issued protective order or bond condition. *Id.* Paul Henri Wagner, appellant, was

---

[1]    TEX. PENAL CODE § 25.07(a)(2)(A) (West 2018).

charged and convicted under that statute after a jury determined that he communicated with his estranged wife, Laura, in a harassing manner in violation of a protective order that had been issued against him for her protection due to a history of family violence. The court of appeals affirmed appellant's conviction on direct appeal over his challenge to the statute's constitutionality on overbreadth and vagueness grounds under the First and Fourteenth amendments to the federal Constitution. *See Wagner v. State*, No. 05-13-01329-CR, 2015 WL 2148103, at *6 (Tex. App.—Dallas May 5, 2015) (mem. op., not designated for publication). We agree with the court of appeals that the statute, if interpreted in accordance with its plain meaning, is not overbroad because it does not reach a substantial amount of constitutionally protected speech, in that it applies only to a limited number of people whose communications have been restricted by a judge through a bond or protective order, and it prohibits only communications that are intentionally or knowingly made in a threatening or harassing manner towards particular protected individuals. We similarly conclude that the statute, as applied to appellant's conduct, is not impermissibly vague because the plain statutory terms are such that they would afford a person of ordinary intelligence a reasonable opportunity to know that his course of conduct would be prohibited. Accordingly, we will affirm the court of appeals's judgment upholding appellant's conviction.

## I. Background

Appellant and the complainant in this case, Laura, were formerly married. In October 2011, appellant was arrested and charged with Class C misdemeanor family-violence assault

against Laura. Around that same time, the couple separated after Laura indicated to appellant her desire to pursue a divorce.

Around one month after the couple had separated, Laura sought a protective order against appellant. In her affidavit in support of her application, Laura detailed a history of family violence that appellant had committed against her.[2] On November 16, 2011, a district court entered an order of protection that prohibited appellant from, among other things, "communicating directly with [Laura] in a threatening or harassing manner." The order contained a finding that family violence had occurred and was likely to occur in the foreseeable future.[3]

---

[2] In her affidavit, Laura explained that appellant had engaged in violent behavior towards her, including pulling her hair; taking her phone away and breaking it; yelling and screaming at her; pushing her up against the wall using his head and chest; throwing and breaking things in the house such as dishes and furniture; locking her out of the house; squeezing and pinching her arm while she was holding their daughter; kicking their daughter's crib causing it to break; using a hammer to hit the hood, fender, and headlights of her car; and being violent towards the family dog by grabbing and choking the dog and slamming the dog up against a wall. Laura explained that appellant's "strange and violent behavior" frightened her and thus she was seeking protection from the court upon separating from him.

[3] The full terms of the protective order stated, "It is therefore ordered that Paul-Henri Alexander Wagner is prohibited from: (1) Committing family violence against Laura Elisabeth Wagner; (2) Communicating directly with Laura Elisabeth Wagner or a member of the family or household of Laura Elisabeth Wagner in a threatening or harassing manner; (3) Communicating a threat through any person to Laura Elisabeth Wagner or a member of the family or household of Laura Elisabeth Wagner; (4) Going to or within 500 feet of the residence of Laura Elisabeth Wagner, or a member of the family or household of Laura Elisabeth Wagner . . . . ( 5) Going to or within 500 feet of the employment or business of Laura Elisabeth Wagner or a member of the family or household of Laura Elisabeth Wagner . . . . [or] (6) Engaging in conduct directed specifically toward a person who is a person protected by an order or a member of the family or household of a person protected by an order, including following the person, that is reasonably likely to harass, annoy, alarm, abuse, torment, or embarrass the person." The order also required appellant to complete a batterer's intervention and prevention counseling program. The order was to be in effect for a period

The first week after the protective order was signed, Laura and appellant communicated by text message until she told him to only use email for his communication with her. On November 17, Laura sent appellant a text message saying, "I pray for u everyday [sic]. That you would be humbled in the sight of the Lord and redeemed." The following day, appellant responded to Laura's message by saying that he prayed for her every day, too. In several subsequent text messages over the next few days, Laura and appellant discussed financial and logistical matters, including issues pertaining to the payment of bills and whether appellant had found a job. At one point, Laura asked appellant whether he would be getting unemployment benefits. Appellant responded by inquiring whether Laura had hired a divorce attorney and explaining that his attorney wanted to communicate with her attorney. Laura did not respond. Appellant then sent a text message asking Laura, "Are you still wanting to talk?" She responded, "I think it would be best not to talk except through email." Appellant responded, "Why?" Laura replied, "Please just respect my wishes." The following day, appellant emailed Laura twice. In his first email, appellant discussed financial matters, but he also professed his love for Laura and expressed his desire to be reconciled. Laura replied to appellant's email by discussing only bills and financial matters. Appellant sent a reply email to Laura again addressing financial matters, and again expressing his desire to be reconciled.

During a six-day period of time, beginning on November 23, appellant sent over a

---

of six months.

dozen text messages to Laura until she again instructed him to stop texting her. On November 23, appellant sent a text message stating, "I miss you so much Laura." Laura did not respond. On November 25, appellant sent Laura another text message asking whether he could pay the daycare bill online. The two exchanged several text messages regarding financial matters. Appellant then sent a text message again telling Laura that he wanted to reconcile with her. In response to this message, Laura sent appellant a text message asking whether their medical insurance was still in effect. Appellant replied the next day, November 26, by asking Laura whether she was alright. Laura replied, "Yes." Appellant then sent another text message stating, "Please don't be cold and hard towards me. My heart is in so much pain without you." Laura responded that she needed to know about the insurance because their daughter needed medicine. Appellant then replied to that message by confirming that his health insurance had been suspended. Appellant and Laura exchanged several more text messages regarding their health insurance and the health of their daughter. Appellant sent a text message asking whether Laura's attorney would be contacting his attorney. Laura did not reply. On November 28, appellant sent Laura several text messages asking for items from the house and again asking Laura to have her attorney contact his attorney. Laura replied, "Who says I have an attorney?" Appellant then asked Laura again whether she had hired an attorney. After Laura did not reply, appellant then sent another text message stating, "It would be so much easier if we could just talk on the phone." Laura did not respond. Appellant then sent another text message stating, "Can we talk on the phone?"

Laura refused and told appellant she was trying to sleep and that she had work the next day. After that, appellant texted Laura again to inquire whether she had a lawyer. Laura responded, "Stop texting me."

On November 30, appellant emailed Laura to discuss financial matters, and the two exchanged a series of emails discussing those matters between November 30 and December 2.

During the four days beginning on December 5, when appellant was served with a divorce petition, he called Laura at least twice, and he emailed her five times asking her not to divorce him. On December 5, appellant called Laura and left a voicemail in which he was upset and crying and begged her not to pursue the divorce. That same day, appellant sent Laura a lengthy email that included poetry, prayers, bible references, professions of love, and pleas for reconciliation. This email included the following passage:

> Due to the ways of men and the powers that be, I have been prohibited from coming before her in humility to profess my love. "Do not speak or write," they say. "A weapon against you will be sought after in your words of love. She brought down men who seek destruction on you twice already. Why would you even trust her a third time?" But I cannot be silent any longer. My heart fails for not proclaiming my love for Laura.

Laura did not respond to this email. On December 6, appellant sent Laura another email asking why she had deceived him by hiring an attorney without informing him. Appellant asked Laura to "cancel this divorce and let us be separated for a time until I can prove myself to you." Appellant continued his requests for forgiveness and reconciliation. On December 7, appellant emailed Laura again. In the email, appellant again pleaded with Laura that she

not divorce him, stating, "Please don't divorce me Laura. I'm begging you, please. I'll do anything, anything at all. Give me time to prove myself. . . . This is our marriage and I'll do anything to save it." On December 8, appellant sent Laura two more emails. In the first email, he again pleaded with her not to proceed with the divorce. In the second email, he stated that he had been having anxiety attacks and trouble breathing and did not know what to do.

On the evening of December 8, Laura received a forwarded email that appellant had sent two days earlier to members of the couple's church asking them to help him in his efforts to stop the divorce. Appellant explained that Laura had declined to forgive him and that she would not speak to him anymore. Appellant asked the church members to contact Laura and urge her to wait and be patient, allowing him time to "prove himself" to her. The church members forwarded the email to Laura. Two days later, Laura complained to the police that appellant had violated the protective order.

Appellant was subsequently charged and tried by a jury for violating the protective order by communicating with Laura in a harassing manner. *See* TEX. PENAL CODE § 25.07(a)(2)(A). After the trial court overruled his objections to the statute on overbreadth and vagueness grounds, the jury convicted him, and he was sentenced to one year in jail, probated for twenty-four months, and a fine of $375.

On direct appeal, appellant challenged his conviction by arguing that Section 25.07(a)(2)(A) is overbroad and vague in violation of his rights under the federal

Constitution. The court of appeals rejected appellant's arguments by discussing three matters. *Wagner*, 2015 WL 2148103, at *3-4.

First, observing that appellant's vagueness and overbreadth challenges were both related to the statute's failure to include any definition for the word "harassing," the court of appeals construed the challenged statutory term. *Id.* at *3. Applying the ordinary dictionary definition of the word "harass," it determined that a person harasses another in this context when he "persistently disturbs, bothers continually, or pesters that person." *Id.* (citing WEBSTER'S ENCYCLOPEDIC UNABRIDGED DICTIONARY 645 (1989)).

Second, the court of appeals considered appellant's complaint that the statute was overbroad because it allowed him to be prosecuted for speech protected by the First Amendment, such as his communications with Laura about financial matters, their child, and his desire to reconcile with her. *Id.* In rejecting this argument, the court reasoned that "[h]arassment is not protected speech under the First Amendment and is not communication, although it may take the form of speech." *Id.* (citing *Garcia v. State*, 212 S.W.3d 877, 888-89 (Tex. App.—Austin 2006, no pet.)). Given that the statute "only prohibits intentional or knowing communication with a protected individual that is threatening or harassing," the court of appeals rejected appellant's overbreadth challenge. *Id.*

Third, the court of appeals considered appellant's related complaint that the statute was vague because it failed to afford him a reasonable opportunity to know that his communications to Laura would be deemed in a "harassing manner." *Id.* at *4. The court

began its analysis by deciding that the applicable standard of review required it to consider whether the statute was vague as applied to appellant's conduct before it could consider any facial vagueness complaint. *Id.* (citing *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495 (1982)). In rejecting appellant's as-applied vagueness challenge, the court of appeals reasoned that the evidence showed that appellant either intended or knew that his communications to Laura would persistently disturb, bother continually, or pester her. *Id.* In support of this assessment, the court of appeals observed that appellant continued to text and call Laura even after she had said it would be best to communicate through email; he made "at least eight unsolicited communications to Laura in the three-week period following the issuance of the protective order and six of those communications occurred between December 5 and December 8, after he was served with divorce papers"; and appellant at one point acknowledged in an email that he had been "prohibited from professing his love to Laura, but was doing so anyway." *Id.* Given these facts, the court of appeals concluded that, measured by common understanding and practice, the statutory language was not unconstitutionally vague as applied to appellant's conduct. *Id.* In light of its rejection of appellant's as-applied vagueness challenge, the court of appeals summarily concluded that any facial challenge would necessarily fail. *Id.*

This Court granted appellant's petition for discretionary review to determine whether the court of appeals erred in its statutory interpretation of Section 25.07(a)(2)(A) and to

review its analysis of appellant's vagueness and overbreadth challenges to the statute.[4]

## II. Analysis of Constitutionality of Penal Code Section 25.07(a)(2)(A)

In his first ground in his petition for discretionary review, appellant challenges the court of appeals's interpretation of the statutory phrase, "communicates . . . in a . . . harassing manner." He contends that, if that phrase is afforded the broad meaning applied by the court of appeals, then the statute is impermissibly overbroad and vague in violation of the federal Constitution. In particular, appellant complains that the statute, as applied to him, infringed upon his First Amendment right to communicate with Laura regarding family matters such as finances and the care of their child, as well as his love for her and his desire to avoid a divorce. Appellant further contends that, due to the statute's failure to contain any definition for the word "harassing," he was deprived of a reasonable opportunity to know whether his repeated attempts at persuading Laura to reconcile with him would constitute prohibited conduct.

We disagree with appellant's arguments. Because appellant has challenged the constitutionality of Section 25.07(a)(2)(A) based on its overbreadth and vagueness, we begin

---

[4]     Appellant presents three grounds for review:

(1) What is the correct definition of the phrase "communicating . . . in a . . . harassing manner" as used in the statute for protective orders in family violence cases, and, as applied in this case, did it penalize protected speech in violation of petitioner's First Amendment rights?

(2) Whether this is a content-based First Amendment case and ought to have been decided by a different standard of review, "strict scrutiny" as enunciated in the case of *Ex parte Lo.*

(3)  If strict scrutiny is the proper standard of review, whether the correct standard of review can be waived.

our analysis by examining the meaning of the relevant statutory language. We then explain our conclusion that the statute is not overbroad due to its narrow applicability in prohibiting only intentional or knowing communications made in a threatening or harassing manner by individuals subject to a judicial order or bond condition towards protected individuals. We then show why the statute is not vague as applied to appellant because the common meaning of the statutory term "harassing" is clear enough to afford a person of ordinary intelligence a fair opportunity to know that appellant's course of conduct would be prohibited.

### A. Statutory Construction of Section 25.07(a)(2)(A)

"The first step in overbreadth analysis is to construe the challenged statute; it is impossible to determine whether a statute reaches too far without first knowing what the statute covers." *United States v. Williams*, 553 U.S. 285, 293 (2008). To determine the meaning of the statute, we apply rules of statutory construction to the statutory text. Based on the application of these rules, we conclude that this statute narrowly applies to a limited group of people under a specified set of circumstances, and it requires evidence that a defendant acted with a culpable mental state in communicating in a harassing manner, such that the communications would persistently disturb, bother continually, or pester another person.

### 1. Rules of Statutory Construction

In determining whether a law is vague and/or overbroad, we keep in mind the elementary principle of statutory construction: we interpret a statute in accordance with the

plain meaning of its language unless the language is ambiguous or the plain meaning leads to absurd results that the Legislature could not possibly have intended. *Sanchez v. State*, 995 S.W.2d 677, 683 (Tex. Crim. App. 1999) (citing *Boykin v. State*, 818 S.W.2d 782, 785-86 & 786 n.4 (Tex. Crim. App. 1991)). In determining plain meaning, words and phrases must be read in context and construed according to the rules of grammar and usage. *Id.* (citing TEX. GOV'T CODE § 311.011(a)). We presume that every word has been used for a purpose and that each word, phrase, clause, and sentence should be given effect if reasonably possible. *Arteaga v. State*, 521 S.W.3d 329, 334 (Tex. Crim. App. 2017) (citing *State v. Hardy*, 963 S.W.2d 516, 520 (Tex. Crim. App. 1997)).

If the language of the statute is plain, we will effectuate that plain language without resort to extra-textual sources. *Cary v. State*, 507 S.W.3d 750, 756 (Tex. Crim. App. 2016). However, if an interpretation of the plain language would lead to absurd results or the language is ambiguous, then we may review extra-textual resources to discern the legislative intent underlying the statutory language. *Id.* A statute is ambiguous when it is reasonably susceptible to more than one interpretation. *Arteaga*, 521 S.W.3d at 334.

### 2. Section 25.07(a)(2)(A) Has Narrow Applicability

Applying the rules of statutory construction to the terms in Section 25.07(a)(2)(A), we observe at the outset that this statute has narrow applicability in that it applies only in a very precise set of circumstances to a limited group of individuals. Specifically, the statute requires proof that, at the time of the complained-of communications, the defendant was

subject to one of seven types of judicially imposed bond conditions or protective orders that prohibited him from communicating in a threatening or harassing manner with a protected person due to a history of committing violence or abuse against the person. TEX. PENAL CODE § 25.07(a).[5] In pertinent part, Section 25.07(a)(2)(A) states,

> VIOLATION OF CERTAIN COURT ORDERS OR CONDITIONS OF BOND IN A FAMILY VIOLENCE, CHILD ABUSE OR NEGLECT, SEXUAL ASSAULT OR ABUSE, STALKING, OR TRAFFICKING CASE
>
> (a) A person commits an offense if, in violation of a condition of bond set in a family violence, sexual assault or abuse, stalking, or trafficking case and related to the safety of a victim or the safety of the community, an order issued under Chapter 7A, Code of Criminal Procedure,[6] an order issued under Article 17.292, Code of Criminal Procedure,[7] an order issued under Section 6.504,

---

[5] Those seven situations are: (1) a bond set in a family violence, sexual assault or abuse, stalking, or trafficking case where the condition is related to the safety of the victim or community; (2) a protective order entered for the protection of a victim of sexual assault or abuse, stalking, or trafficking; (3) an emergency protective order entered by a magistrate at a defendant's appearance on charges of family violence or certain sexual offenses; (4) a protective order issued on the motion of a party to a suit for dissolution of a marriage in situations in which the judge finds that family violence has occurred and is likely to occur in the future; (5) a temporary ex parte protective order if the court determines that there is a clear and present danger of family violence and if the order has been served on the person subject to the order; (6) a protective order issued due to a finding that family violence has occurred and is likely to occur in the future; or (7) a protective order issued in another jurisdiction so long as it complies with certain requirements. TEX. PENAL CODE § 25.07(a).

[6] Chapter 7A, Code of Criminal Procedure, is entitled, "Protective Order for Victims of Sexual Assault or Abuse, Stalking, or Trafficking." That chapter details the procedures for entering a protective order under circumstances in which the court finds reasonable grounds to believe that the person applying for such order is a victim of sexual assault or abuse, stalking, or trafficking. *See* TEX. CODE CRIM. PROC. arts. 7A.03, 7A.05.

[7] Code of Criminal Procedure Article 17.292 is entitled, "Magistrate's Order for Emergency Protection." That statute permits an order for emergency protection at a defendant's appearance before a magistrate after arrest for an offense involving family violence or specified sexual offenses, and mandates an order for emergency protection "if the arrest is for an offense that also involves: (1) serious bodily injury to the victim; or (2) the use or exhibition of a deadly weapon during the commission of an assault." TEX. CODE CRIM. PROC. art. 17.292(a), (b). The magistrate's emergency

Family Code,[8] Chapter 83, Family Code, if the temporary ex parte order has been served on the person,[9] or Chapter 85, Family Code,[10] or an order issued by another jurisdiction as provided by Chapter 88, Family Code,[11] the person knowingly or intentionally: . . .

(2) communicates:

(A) directly with a protected individual or a member of the family or household in a threatening or harassing manner[.]

*Id.* § 25.07(a)(2)(A).[12]  By its terms, the statute applies only in the very limited context of

---

order may, among other restrictions, prohibit the arrested party from communicating "directly with a member of the family or household or with the person protected under the order in a threatening or harassing manner[.]" *Id.* art. 17.292(c)(2)(A).

[8]     Section 6.504, Family Code, permits a court to render a protective order on the motion of a party to a suit for dissolution of a marriage as provided by Subtitle B, Title 4.  TEX. FAM. CODE § 6.504.  Title 4 permits a judge to issue a protective order when family violence has occurred and family violence is likely to occur in the future. *Id.* § 81.001 et seq.

[9]     Chapter 83, Family Code, permits a court to issue a temporary ex parte order, without notice to the individual alleged to have committed family violence and without a hearing, if the court determines upon receiving an application for a protective order that there is a clear and present danger of family violence.  *See* TEX. FAM. CODE § 83.001(a).   The judge may direct a respondent to do or refrain from doing specified acts.  *Id.* § 83.001(b). The order may not exceed twenty days but it may be extended for an additional twenty days at the request of the applicant or on the court's own motion. *Id.* § 83.002.

[10]    Chapter 85, Family Code, entitled "Issuance of Protective Orders," requires a court to render a protective order when it has found that family violence has occurred and that family violence is likely to occur in the future.  TEX. FAM. CODE § 85.001. The order may not be for a period of more than two years unless the respondent caused serious bodily injury to the applicant or a member of the applicant's family or household, or the respondent was the subject of two or more previous protective orders rendered under certain specified circumstances. *Id.* § 85.025(a-1).

[11]    Chapter 88, Family Code, is the Uniform Interstate Enforcement of Domestic Violence Protection Orders Act. TEX. FAM. CODE § 88.001 et seq.  Chapter 88 provides that the courts of this state shall enforce the terms of a protective order from another jurisdiction so long as it complies with certain requirements.  TEX. FAM. CODE § 88.003(a), (d).

[12]    Section 25.07 has been amended several times since appellant committed this offense. Because the provisions under which appellant was charged are not affected by the amendments, we

situations where, at the time of the challenged conduct, a defendant was actively subject to one of these seven types of judicial conditions or orders in a family violence, sexual abuse, stalking, or trafficking case that expressly prohibited him from communicating in threatening or harassing manner with a protected person.

### 3. The Culpable Mental State

The statute requires proof of a culpable mental state of "knowingly or intentionally." *Id.* § 25.07(a). Applying the rules of grammar and usage, we conclude that the requirement of a culpable mental state applies to the entire phrase, "communicates directly with a protected individual or a member of the family or household in a threatening or harassing manner." That is, the statute requires proof of a defendant's knowledge or intent as to each element including (1) that he communicated; (2) directly; (3) with a protected individual or a member of the family or household; (4) in a threatening or harassing manner. *Id.* § 25.07(a)(2)(A).

### 4. The Meaning of "Harassing Manner"

At the center of appellant's complaint in this case is the proper meaning of the statutory phrase "communicates . . . in a . . . harassing manner."[13] We conclude that these

---

cite to the current version of the statute.

[13]     As we have discussed above, the statute prohibits an individual from communicating in a "threatening or harassing" manner with a protected individual in violation of a protective order or bond condition. *See* TEX. PENAL CODE § 25.07(a)(2)(A). Because the State's theory of this case was that appellant's communications to Laura were in a "harassing manner," and the parties on appeal do not appear to argue that the communications were also "threatening," we will focus on the meaning of "harassing" in this context, rather than the meaning of the word "threatening."

terms, viewed in the particular context of this statute, have ordinary meanings that are commonly understood. Pursuant to the rules of statutory construction, we will apply the plain meanings of these terms unless doing so would lead to absurd results that the Legislature could not possibly have intended. *Sanchez*, 995 S.W.2d at 683.

Applying the ordinary meanings of the statutory terms, a person communicates in a "harassing manner" if the mode or method by which he communicates[14] is such that it would persistently disturb, bother continually, or pester another person. *See* WEBSTER'S ENCYCLOPEDIC UNABRIDGED DICTIONARY 645 (1989).[15] The definition's description of the phrases "persistently disturb" and "bother continually" necessarily requires multiple events of harassing communication. Similarly, the word "pesters," in turn, has a commonly understood meaning of troubling or annoying someone with frequent or persistent requests or interruptions. *See Pester*, NEW OXFORD AMERICAN DICTIONARY 1310 (3d ed. 2010). Our interpretation of the word "harassing" is consistent with the court of appeals's interpretation of that term in accordance with its plain meaning. *See Wagner*, 2015 WL 2148103, at *3.

---

[14] WEBSTER'S NEW INTERNATIONAL DICTIONARY 460, 1376 (3d ed. 2002) (defining "manner" as "the mode or method in which something is done or happens: a mode of procedure or way of acting"; defining "communicates" as to "send information or messages," speak, gesticulate, or write directly to another to convey information).

[15] *See also* WEBSTER'S NEW INTERNATIONAL DICTIONARY 1031 (3d ed. 2002) (defining "harassing" as "causing or tending to cause harassment"; "harassment" is "the act or instance of harassing; VEXATION; ANNOYANCE;" "the condition of being harassed"; "harass" means "to vex, trouble, or annoy continually or chronically (as with anxieties, burdens, or misfortune); PLAGUE, BEDEVIL, BADGER"); WEBSTER'S NEW COLLEGIATE DICTIONARY 552 (9th ed. 1988) (harass is "to annoy persistently"); WEBSTER'S NEW WORLD COLLEGIATE DICTIONARY 613 (3d ed. 1996) (harass is "to trouble, worry, or torment, as with cares, debts, repeated questions, etc.").

In sum, pursuant to the common meanings of the statutory terms, a person of ordinary intelligence would understand that, if he has been enjoined from communicating in a harassing manner towards a particular person through one of the specified types of protective orders or bond conditions, then this statute prohibits him from intentionally or knowingly sending information or messages to, or speaking to, the protected person in a manner that would persistently disturb, bother continually, or pester another person. This type of conduct may include persistent, frequent, or continual requests or interruptions that the actor engages in with the knowledge or intent that such conduct would disturb, bother, or pester a person whom a court has already determined is in need of greater protection than other people based on a risk that the defendant may harm the protected person in the future. Finding that the terms are not ambiguous, and finding no absurdity in applying the plain meanings of these terms, we will effectuate the statute's plain language without resort to extra-textual considerations. *See Cary*, 507 S.W.3d at 756.

Having construed the statutory language in accordance with its plain meaning, we now turn to consider appellant's arguments that, by applying this plain meaning, the statute is overbroad and vague in violation of his constitutional rights.

**B. The Statute Is Not Overbroad in Violation of the First Amendment**

In support of his argument that Section 25.07(a)(2)(A) is overbroad in violation of the First Amendment, appellant contends that, by prohibiting him from expressing his love for Laura and his desire to reconcile with her, the statute infringed upon constitutionally

protected areas of speech. After we review the applicable law for overbreadth claims, we explain the basis for our conclusion that the statute does not infringe upon a substantial amount of constitutionally protected speech and thus is not overbroad.

**1. Overview of First Amendment Overbreadth Doctrine**

The First Amendment provides in relevant part that "Congress shall make no law . . . abridging the freedom of speech." U.S. CONST. amend. I. As a general matter, the First Amendment "'means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content.'" *Ashcroft v. Am. Civil Liberties Union*, 535 U.S. 564, 573 (2002) (quoting *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 65 (1983)).

Ordinarily, a facial challenge to the constitutionality of a statute can succeed only when it is shown that the statute is unconstitutional in all of its applications. *State v. Johnson*, 475 S.W.3d 860, 864 (Tex. Crim. App. 2015). The First Amendment overbreadth doctrine provides an exception to this rule whereby a litigant may succeed in challenging a law that regulates speech if "a 'substantial number' of its applications are unconstitutional, 'judged in relation to the statute's plainly legitimate sweep.'" *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 n.6 (2008) (quoting *New York v. Ferber*, 458 U.S. 747, 770 (1982)). Thus, the overbreadth doctrine prohibits the government from "banning unprotected speech if a substantial amount of protected speech is prohibited or chilled in the process." *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 255 (2002). The overbreadth

doctrine is "strong medicine" to be employed with hesitation and only as a last resort. *Ex parte Thompson*, 442 S.W.3d 325, 349 (Tex. Crim. App. 2014) (citing *Ferber*, 458 U.S. at 769).

### 2. The Statute is Not Overbroad

Applying these principles to the instant statute, we conclude that Section 25.07(a)(2)(A) does not reach a substantial amount of constitutionally protected conduct, judged in relation to its plainly legitimate sweep. *Wash. State Grange*, 552 U.S. at 449 n.6. As we have already observed in our analysis of the statutory language, the statute applies only in a very limited set of circumstances to family violence or other abusers whose communications with a particular person have been judicially restricted through a protective order or bond condition. Thus, this statute is distinguishable from other types of statutes that may purport to broadly regulate the speech of all individuals.[16] Because the statute applies only to communications from one particular person to another, the communications at issue will almost always involve matters of purely private concern, rather than matters of public concern, which is a consideration that reduces the likelihood of any substantial infringement upon First Amendment protections here.[17] Additionally, because many of the specified types

---

[16] *See, e.g., Ex parte Lo*, 424 S.W.3d 10, 26 (Tex. Crim. App. 2013) (striking down portion of former online-solicitation statute as overbroad, in part, because statute prohibited all sexually explicit electronic communications made by all adults towards all minors).

[17] *See Ex parte Thompson,* 442 S.W.3d 325, 343 (Tex. Crim. App. 2014) (observing that the "[g]overnment has greater leeway to regulate [speech] when a nonpublic forum is involved or when serious privacy interests are implicated"; First Amendment limits "are less rigorous when the speech involves matters of purely private concern").

of protective orders limit the duration of time for which such an order may be imposed to a period of two years or less, an individual is subject to the statute's terms for the limited period of time during which the order is in effect.[18] The existence of these factors that significantly limit the statute's scope of applicability weighs heavily against appellant's claim that the statute infringes upon a substantial amount of constitutionally protected speech.

As the basis for its conclusion that the statute is not overbroad, the court of appeals reasoned that, by prohibiting only harassing communications made by a person subject to a protective order towards a protected individual, the statute does not implicate any constitutionally protected speech. *See Wagner*, 2015 WL 2148103, at *3. We agree. In support, we observe that, in *Scott v. State*, we held that the First Amendment affords no protection to communicative conduct whereby one individual invades the substantial privacy interests of another in an essentially intolerable manner. 322 S.W.3d 662, 670 (Tex. Crim. App. 2010). The issue in *Scott* was whether the telephone-harassment statute implicated the free-speech guarantee of the First Amendment. *Id.* at 668.[19] In resolving that issue, we observed that the statute's terms were "directed only at persons who, with the specific intent

---

[18] *See, e.g.,* TEX. FAM. CODE § 85.025(a) (generally providing for two-year duration of protective order due to finding of family violence, except in specified situations in which the judge determines that a longer period is needed and the judge makes specific required findings in support of that determination); *but see* TEX. CODE CRIM. PROC. art. 7A.07 (imposing no limitation on duration of protective order in cases involving sexual assault or abuse, stalking, or trafficking).

[19] The statute at issue in *Scott* provided, "A person commits an offense if, with intent to harass, annoy, alarm, abuse, torment, or embarrass another, he . . . makes repeated telephone communications . . . in a manner reasonably likely to harass, annoy, alarm, abuse, torment, embarrass, or offend another." TEX. PENAL CODE § 42.07(a)(4).

to inflict emotional distress, repeatedly use the telephone to invade another person's personal privacy and do so in a manner reasonably likely to inflict emotional distress." *Id.* at 669-70. In holding that the statute was not susceptible of application to communicative conduct that is protected by the First Amendment, we reasoned that such conduct would "invade[ ] the substantial privacy interests of another (the victim) in an essentially intolerable manner." *Id.* at 670. We thus concluded that the statute did not implicate the free-speech guarantee of the First Amendment. *Id.* at 669.

Although Section 25.07(a)(2)(A) is distinguishable in some ways from the statute that was at issue in *Scott,* our reasoning from that case leads us to conclude that appellant's overbreadth challenge should be rejected. Here, the statute at issue prohibits communications that are intentionally or knowingly made in a harassing manner towards a protected individual in direct violation of a judicial order or bond condition that expressly restricts such communications.[20] Here, as in *Scott*, the statute is capable of reaching only conduct that is not entitled to constitutional protection because such conduct will, by definition, invade the substantial privacy interests of the complainant in an essentially intolerable manner. *Id.* at 670. Thus, we agree with the court of appeals that appellant's overbreadth claim must fail because the statute is capable of reaching only non-constitutionally protected speech.

In further support of this conclusion, we observe that courts in other jurisdictions have

---

[20]     *See* TEX. PENAL CODE § 25.07(a)(2)(A).

held in similar situations that a judicial order restricting a person's speech due to a history of committing verbal or physical abuse against another person does not implicate significant First Amendment concerns.[21] In an analogous case, the Maine Supreme Court has observed that, "[t]o disallow the imposition of an order restraining contact when abuse and harassment have already occurred, and a person has a demonstrable need for protection from further abusive and harassing conduct, 'would establish a precedent that would leave persons powerless to protect themselves against unwanted, annoying, or harassing intrusions on their privacy.' The First Amendment does not support such a precedent." *Childs v. Ballou,* 148 A.3d 291, 297-98 (Me. 2016) (quoting *People in Interest of C.S.M.*, 570 P.2d 229, 230-31 (Colo. 1977)). We agree with this reasoning that, at least in the specific context of a prior history of domestic violence or other type of abuse that has been determined by a judge to be good cause for restraining an individual's speech towards his victim, the First Amendment does not prohibit a court from imposing reasonable restrictions on an abuser's speech for the protection of his victim, nor does it prohibit the government from imposing criminal

---

[21]     *See, e.g., Childs v. Ballou*, 148 A.3d 291, 293, 297 (Me. 2016) (rejecting husband's challenge to protective order barring communications with ex-wife; "the First Amendment's protections do not apply to prevent a court from restraining threatening or abusive communications to persons who have demonstrated a need for protection from an immediate and present danger of domestic abuse") (quotation marks and citations omitted); *State v. Hauge*, 547 N.W.2d 173, 176 (S.D. 1996) (rejecting defendant's overbreadth challenge to statute criminalizing violation of protective order; the restraint upon Hauge's speech that had been imposed for his ex-wife's benefit due to a history of physical abuse did not "fall[ ] within the ambit of the rights of free speech protected by the First Amendment"); *State v. Mott*, 692 A.2d 360, 365 (Vt. 1997) (affirming conviction for violating an abuse-prevention order over the defendant's First Amendment challenge to the underlying order; "Defendant has no First Amendment right to inflict unwanted and harassing contact on another person. . . . Nor is the prohibition overbroad because it involves communication.").

sanctions for the violation of such an order. The government's significant need to regulate speech in this narrow context as a means of protecting victims of abuse from further harm outweighs any concerns we might have regarding the possibility that the statute might infringe upon constitutionally protected expression in some rare circumstances that are not before us in the instant case.[22]

We will not strike down a statute as overbroad unless "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Wash. State Grange*, 552 U.S. at 449 n.6. Here, appellant has not presented us with any possible unconstitutional applications of the statute, aside from simply arguing that the statute is unconstitutional as applied to him because it infringed upon his First Amendment right to express his love for Laura and his desire to reconcile with her. But, as the court of appeals observed, the statute did not prohibit appellant from communicating with Laura on any particular topic—it merely prohibited him from doing so in a manner that he knew would, or intended to, persistently disturb, bother continually, or pester her. *See Wagner,* 2015 WL 2148103, at *4. Furthermore, to the extent that appellant argues that the statute is overbroad because defendants may refrain from engaging in protected speech due to their uncertainty about what the statute covers, we disagree. As we have noted above, the statute

---

[22]     *See Rew v. Bergstrom,* 845 N.W.2d 764, 779 (Minn. 2014) ("There is little question that the prevention of domestic violence and the protection of the health and safety of domestic-abuse victims and members of their household and family are significant government interests."); *State v. Doyle*, 787 N.W.2d 254, 259 (Neb. 2010) ("The state has a compelling interest in protecting victims of domestic violence from continuing harassment and abuse.").

penalizes only communications that a defendant intends or knows to be in a harassing manner. The statute's requirement of a culpable mental state as to the harassing manner of the communications further undermines appellant's contention that the statute will chill any protected speech.[23] Under these circumstances, we conclude that the statute does not have a substantial number of unconstitutional applications judged in relation to its plainly legitimate sweep, and thus is not overbroad in violation of the First Amendment. We, therefore, agree with the court of appeals's rejection of appellant's overbreadth complaint.

### C. Section 25.07(a)(2)(A) Is Not Vague As Applied to Appellant

In a complaint that is closely related to his overbreadth challenge, appellant also contends that Section 25.07(a)(2)(A) is impermissibly vague due to its failure to provide any definition for the meaning of the phrase "harassing manner." As a result, he contends that he was deprived of a reasonable opportunity to know whether his conduct would be prohibited. He urges that, in order to avoid a vagueness problem in this case, we must adopt a narrower definition of the word "harass" that would restrict the statute's meaning to communications that are lacking in any legitimate purpose and inflict substantial emotional distress on a victim. In response, the State contends that the court of appeals correctly applied the plain meaning of the word "harass," and it urges that the statute is not

---

[23] *See United States v. Conlan,* 786 F.3d 380, 386 (5th Cir. 2015) (scienter requirement in federal stalking statute "narrows its scope and mitigates arbitrary enforcement"); *United States v. Osinger*, 753 F.3d 939, 945 (9th Cir. 2014) (holding that scienter requirement of intent to harass "thoroughly undermines [the defendant's] contention that he was unable to discern that his harassment of [the complainant] was proscribed").

impermissibly vague if given its plain meaning. Because we agree with the court of appeals that the plain meaning of the phrase "harassing manner" is not impermissibly vague as applied to appellant's conduct, we reject his vagueness challenge, and we decline to adopt a narrower definition of that term that would severely limit the statute's applicability.

### 1. Overview of the Vagueness Doctrine

It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined. *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972). "A conviction fails to comport with due process if the statute under which it is obtained fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *Williams*, 553 U.S. at 304. Where a statute abuts upon sensitive areas of First Amendment freedoms, "the doctrine of vagueness 'demands a greater degree of specificity than in other contexts.'" *Long v. State*, 931 S.W.2d 285, 287-88 (Tex. Crim. App. 1996) (quoting *Kramer v. Price*, 712 F.2d 174, 177 (5th Cir. 1983)). "Greater specificity is required to preserve adequately the right of free expression because '[u]ncertain meanings inevitably lead citizens to steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked.'" *Id.* at 288 (quoting *Grayned*, 408 U.S. at 109). "But 'perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity.'" *Holder v. Humanitarian Law Project*, 561 U.S. 1, 19 (2010) (quoting *Williams*, 553 U.S. at 304).

A statute is not unconstitutionally vague merely because the words or terms used are not specifically defined. *Bynum v. State*, 767 S.W.2d 769, 774 (Tex. Crim. App. 1989); *see also State v. Holcombe*, 187 S.W.3d 496, 499 (Tex. Crim. App. 2006). Rather, "the words or phrase must be read in the context in which they are used," and ordinarily the statute must then be construed according to the rules of grammar and common usage. *Bynum,* 767 S.W.2d at 774. A statute satisfies vagueness requirements if the statutory language "conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices." *Jordan v. DeGeorge*, 341 U.S. 223, 231-32 (1951).

In general, in addressing a vagueness challenge, we will consider whether the statute is vague as applied to a defendant's conduct before considering whether the statute may be vague as applied to the conduct of others. *Vill. of Hoffman Estates*, 455 U.S. at 495. "A plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others. A court should therefore examine the complainant's conduct before analyzing other hypothetical applications of the law." *Id.*[24] In the context of a challenge to a statute that does not regulate protected speech, a court should uphold a vagueness challenge only if the statute is impermissibly vague in all of its applications. *Id.* at 494-95.

### 2. The Statute Is Not Impermissibly Vague As Applied

---

[24]    *See also Holder v. Humanitarian Law Project*, 561 U.S. 1, 19-20 (2010); *Martinez v. State*, 323 S.W.3d 493, 507 & n. 84 (Tex. Crim. App. 2010) (a defendant whose speech "'is clearly proscribed'" cannot raise a successful vagueness claim for lack of notice) (quoting *Holder*, 561 U.S. at 19).

Applying the plain language of Section 25.07(a)(2)(A) to the facts of this case, we conclude that the statutory language is sufficiently clear to provide a person of ordinary intelligence a reasonable opportunity to know that appellant's course of conduct would be prohibited. Here, the statute places a person of ordinary intelligence on notice that, under circumstances in which a judge's bond condition or protective order has already restricted his communication with a protected individual, he must not knowingly or intentionally communicate in a harassing manner with the protected individual. *See* TEX. PENAL CODE § 25.07(a)(2)(A). The statute clearly prohibits communications made by a defendant in a manner that he knows or intends would persistently disturb, bother continually, or pester a protected individual. *See id.*

Applying the ordinary meanings of these terms here, we agree with the court of appeals that appellant's vagueness challenge fails because the record shows that he repeatedly communicated with Laura in a manner that a person of ordinary intelligence would know to be persistently disturbing, continually bothersome, or pestering. Specifically, the record here demonstrates that, during a six-day period of time beginning on November 23, appellant sent approximately sixteen text messages to Laura. After that, she told him to stop texting her and to communicate with her only through email. But the record shows that appellant continued texting Laura after she had made that request, prompting her to make a second request that appellant stop texting her.

After appellant was served with a divorce petition, he made at least two phone calls

to Laura and sent four lengthy emails. Appellant called Laura even though she had indicated that she did not wish to speak with him over the phone and wanted to communicate only through email. At various points in his emails, appellant accused Laura of deceiving him by hiring an attorney, claimed he was having an anxiety attack and had trouble breathing, and asked church members to contact Laura to tell her not to divorce him because she was no longer willing to communicate with him. Those emails that accused her of deceit and that suggested she was causing physical harm to him could reasonably be viewed as indicating appellant's intent or knowledge to communicate with Laura in a harassing manner. Viewed in the context of appellant's history of committing violent acts against Laura which prompted a judge to order him not to communicate with her in a harassing manner, these repeated communications were of such a manner that, measured by common understanding and practice, a person of ordinary intelligence would know that they would persistently disturb, bother continually, or pester another person. Because a person of ordinary intelligence under these circumstances would have had a reasonable opportunity to know that this course of conduct was prohibited, appellant's as-applied vagueness challenge fails.[25]

Appellant appears to suggest that some heightened standard of vagueness review should apply to his case, given his assertion that the instant statute is one that regulates

---

[25] *See United States v. Williams*, 553 U.S. 285, 304 (2008); *see also Maynard v. Cartwright,* 486 U.S. 356, 361 (1988) ("Objections to vagueness under the Due Process Clause rest on the lack of notice, and hence may be overcome in any specific case where reasonable persons would know that their conduct is at risk.").

protected speech.[26] But, as we have explained above in our analysis of appellant's overbreadth complaint, even if the statute is afforded its plain meaning, it does not infringe upon any constitutionally protected areas of conduct. Given this, we decline to apply the more stringent vagueness standard that would apply to a statute that abuts upon sensitive areas of First Amendment freedoms.

For similar reasons, we reject appellant's argument that we should limit the meaning of "harassing" in this context to communications that inflict substantial emotional distress and are lacking in any legitimate purpose.[27] For all of the reasons that we have already addressed above, we find the plain statutory language of Section 25.07(a)(2)(A) to be sufficiently clear in providing fair notice, as that concept would apply to appellant's course

---

[26] *See, e.g., Long v. State*, 931 S.W.2d 285, 287-88 (Tex. Crim. App. 1996) (explaining that heightened vagueness standard applies to statutes that may threaten to chill protected speech).

[27] In support of this argument, appellant cites the decision of the Third Court of Appeals in *Garcia v. State*, in which that court adopted a narrowed definition of the word "harassing" in this context in order to avoid a possible vagueness problem. *See* 212 S.W.3d 877, 890 (Tex. App.—Austin 2006, no pet.). We reject that court's reasoning because we disagree that the statute's use of the word "harass" poses any vagueness problem. We note that other courts, in considering similar vagueness challenges to statutes that employ that term, have concluded that the word "harass" is an ordinary term that may be commonly understood and does not render a statute vague. *See, e.g., Conlan,* 786 F.3d at 386 ("harass" is not "obscure" and is "readily understandable by most people"); *Osinger,* 753 F.3d at 945 ("harass" is not an "esoteric or complicated term[ ] devoid of common understanding"); *United States v. Shrader*, 675 F.3d 300, 310-11 (4th Cir. 2012) (observing that "harass" is not an "obscure word[ ]"; "Most people would readily understand [harass] to mean 'to disturb persistently; torment, as with troubles or cares; bother continually; pester; persecute'"); *Galloway v. State*, 781 A.2d 851, 867-68 (Md. Ct. App. 2001) ("harass" is a term "commonly understood by ordinary people and, as such, provide[s] fair notice to potential offenders and adequate guidance for enforcement"); *State v. Richards*, 896 P.2d 357, 364-65 (Id. Ct. App. 1995) ("harass" is a word "commonly employed in ordinary conversation"; inclusion of that word in statute would not "leave a person of normal intelligence wondering at the meaning or searching for definition or clarification").

of conduct. We hold that appellant has failed to show that the statute is unconstitutionally vague as applied to him. In light of this determination, we also agree with the court of appeals that appellant's facial vagueness challenge necessarily fails due to his failure to show that the statute is unconstitutional in all applications.[28]

### III. Dismissal of Appellant's Second and Third Grounds For Review

In his second and third grounds for review, appellant complains that the court of appeals erred by rejecting his argument that this statute is a content-based restriction on speech that is subject to strict scrutiny. *See, e.g., Ex parte Lo*, 424 S.W.3d 10, 15 (Tex. Crim. App. 2013) (discussing standard that applies to review of content-based regulations that "distinguish favored from disfavored speech based on the ideas expressed"). In explaining the basis for its rejection of that argument, the court of appeals reasoned, in a footnote, that appellant had failed to present that argument until his reply brief, and even then, he had presented only "a single paragraph without any legal analysis or discussion[.]" *Wagner*, 2015 WL 2148103, at *3 n.4. The court of appeals determined that, because appellant had failed to put forth any discussion establishing that the statute under which he was convicted was a content-based regulation on speech, and the statute did not on its face appear to be content-based, it would apply the normal standard of review that presumes the statute to be a valid legislative enactment and places the burden of proving its unconstitutionality on the party

---

[28] *See Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 495 (1982); *State v. Johnson*, 475 S.W.3d 860, 864 (Tex. Crim. App. 2015) ("With respect to constitutional provisions other than the First Amendment, a facial challenge to the constitutionality of a statute can succeed only when it is shown that the statute is unconstitutional in all of its applications.").

challenging the statute. *Id*.; *see also Rodriguez v. State*, 93 S.W.3d 60, 69 (Tex. Crim. App. 2002).

We interpret this discussion by the court of appeals as effectively constituting a determination that appellant failed to adequately brief the issue of whether Section 25.07(a)(2)(A) is a content-based restriction on speech for which strict scrutiny would apply. *See* TEX. R. APP. P. 38.1(i). Because there is no decision of the court of appeals for us to review with respect to this matter, we decline to address appellant's arguments on discretionary review regarding that court's application of the ordinary standard of review. *See Cooper v. State*, 933 S.W.2d 495, 496 (Tex. Crim. App. 1996) ("This Court reviews 'decisions' of the courts of appeals; as a general rule, we do not reach the merits of any party's contention when it has not been addressed by the lower appellate court."). We, therefore, dismiss appellant's second and third grounds for review.

## IV.  Conclusion

We agree with the court of appeals's conclusion that Section 25.07(a)(2)(A) did not infringe upon appellant's rights under the federal Constitution due to its overbreadth or vagueness. We, therefore, affirm the judgment of the court of appeals upholding appellant's conviction.

Delivered: February 14, 2018

Publish